**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**vs.**<br><br>**LEANDO RAMONE DAVENPORT and JONATHAN LARRY BALLEW**<br><br>**Defendants.** | **CASE NO.** 1:26-cr-89<br><br>**JUDGE** Dlott<br><br>**INDICTMENT**<br><br>**18 U.S.C. § 1343**<br>**18 U.S.C. § 1346**<br>**18 U.S.C. § 1957**<br>**18 U.S.C. § 2**<br><br>**FORFEITURE ALLEGATIONS** |

**THE GRAND JURY CHARGES:**

At times relevant to this Indictment:

**Relevant Individuals and Entities**

1. The defendant, **LEANDO RAMONE DAVENPORT ("DAVENPORT")**, resided and worked in the Southern District of Ohio.

2. The defendant, **JONATHAN LARRY BALLEW ("BALLEW")**, resided and worked in the Southern District of Ohio.

3. Cincinnati Charter School Collaborative LLC ("CCSC") was incorporated in Ohio as a for-profit entity in 2019. CCSC's stated purpose in its Articles of Incorporation was "Education." **DAVENPORT** signed the Articles of Incorporation as the authorized representative. **DAVENPORT** was a signatory on CCSC bank accounts, including CCSC account ending 0044.

4. Along with CCSC, **DAVENPORT** controlled multiple other for-profit corporate entities, including: AD Staffing, Affinity Rose Bar Lounge LLC, The Rose Garden Lounge LLC, Red Rose Lounge LLC, The Black Rose Café LLC, Royal Rose Lounge LLC, Rose On the River

Lounge LLC, Roses of Ida Mae LLC, Rose Gold Sports Bar LLC, TZ Charters, and Flock Sports Entertainment Center LLC (together and with CCSC, referred to as "**DAVENPORT**-controlled entities").

5. Core Educational Services LLC ("Core") was incorporated in Ohio as a for-profit entity in 2015. Core's stated purpose in its Articles of Incorporation was "Educational Services and Staffing" and "Any other services deem [sic] necessary." **BALLEW** signed the Articles of Incorporation as the authorized representative. **BALLEW** was a signatory on Core bank accounts, including Core account ending 0927.

6. Capital School Services ("CSS") was incorporated in Ohio as a for-profit entity in 2017. CSS's stated purpose in its Articles of Incorporation was "K-12 School Construction and Remodeling Services." **BALLEW** signed the Articles of Incorporation as the authorized representative. **BALLEW** was a signatory on CSS bank accounts, including CSS account ending 8375.

7. Progressive Tech Solutions LLC (Bolden Educational Consulting Services LLC) ("Progressive") registered as a foreign for-profit limited liability company in Ohio in 2021. Individual 1 signed the registration as the authorized representative. **BALLEW** was a signatory on Progressive's bank account ending 4108, which was in the name of Bolden Educational Consulting Services LLC (the "Progressive account").

8. Elite Development Resources LLC ("Elite") was incorporated in Georgia in 2021. Individual 1 signed the Articles of Incorporation as the authorized representative. **BALLEW** controlled Elite's bank account ending 2595.

9. Core, CSS, Progressive, and Elite are hereinafter referred to as the "**BALLEW-**controlled entities."

**Community Schools in Ohio**

10. The Ohio General Assembly legislatively created "community schools," also known as charter schools, as part of Ohio's system of common schools. A community school created under Ohio law is a public school, independent of any school district, and part of Ohio's program of education.

11. A community school is a public office and thus, any officer, employee, or duly authorized representative or agent of a community school is a public official.

12. The public funds received by a community school from the Ohio Department of Education are received and collected under color of office. Public funding to community schools is determined, in part, by the number of full-time equivalent ("FTE") students enrolled at the community school. In Ohio, an FTE student is a measurement used to track public school student enrollment based on the proportion of time or credit hours a student is enrolled.

13. The governing authority of a community school (*e.g.*, the community school's board) may carry out any act and ensure the performance of any function that complies with Ohio law.

14. A community school's governing board may contract with a management company or operator to undertake the daily operation of a community school.

**Dohn Community High School**

15. Dohn Community High School ("Dohn") was incorporated in Ohio as a not-for-profit corporation in and around 1999. Dohn was created as an addiction recovery program for high school students. Dohn operated as a community school under Ohio law from in and around 2001 until 2025.

16. In its Form 990 to the Internal Revenue Service filed in 2020, Dohn described its mission as follows: "Dohn Community High School is a small personalized non-traditional school committed to serving educationally at risk students in a safe orderly environment by developing the basic academic[,] career and social skills needed to pursue options following graduation."

17. From in and around 2015 to 2019, **DAVENPORT** was employed by Dohn as the Superintendent of Dohn.

18. Dohn's governing authority entered a Management Agreement with CCSC in and around December 2019 and Renewal Management Agreements in and around July 2022 and August 2022 (together, "the Management Agreements"). CCSC is listed as the "Operator" of Dohn in the Management Agreements. **DAVENPORT** signed each of the Management Agreements as the Managing Member of CCSC. CCSC, through **DAVENPORT**, served as Operator of Dohn from in and around December 2019 until in and around September 2024.

19. Pursuant to the Management Agreements, the "Operator shall provide the services of an educational leader to serve as Superintendent." In his role as Managing Member of CCSC, **DAVENPORT** served as Superintendent of Dohn. Among his responsibilities as Superintendent of Dohn were "management of day-to-day activities," "professional development of all staff," "enrollment of students into the School," and "Financial Management." As Superintendent of Dohn, **DAVENPORT** was also involved in authorizing payments out of Dohn bank accounts. By agreeing to undertake the daily operation of Dohn, **DAVENPORT**, through CCSC, had a fiduciary relationship with Dohn.

20. Between 2019 and 2024, Dohn received millions of dollars each year in federal and state public education funds. Dohn's funding from state and federal sources was tied, in part, to the number of enrolled FTE students at Dohn. For example, in 2024, Dohn received approximately

$9,751 per student from the state of Ohio and approximately $1,391 per student from the federal government.

21. In fiscal year 2019, Dohn reported approximately 688 enrolled, FTE students. The number of enrolled students at Dohn increased every fiscal year from 2019 until 2024, when Dohn's reported enrollment was approximately 1,676 FTE students. In October 2024, Dohn determined that it had materially overstated the number of students enrolled at Dohn while CCSC, through **DAVENPORT**, was Operator.

22. In and around March 2025, Dohn's governing authority announced that Dohn was closing because of financial challenges.

**<u>Scheme to Defraud</u>**

23. From 2021 to 2024, **BALLEW** submitted false and fraudulent invoices to Dohn on behalf of four entities he controlled—Core, CSS, Progressive, and Elite. In some instances, **BALLEW's** entities did not perform or intend to perform the work charged in the invoices; in others, **BALLEW** knowingly charged inflated amounts to Dohn while serving as the "middleman" between third parties and Dohn. Knowing the invoices were fraudulent, **DAVENPORT** authorized Dohn to pay the **BALLEW**-controlled entities based on those invoices. **BALLEW** then kicked back proceeds of those payments to **DAVENPORT** through the **DAVENPORT**-controlled entities, including CCSC, AD Staffing, and others.

24. In total, during the relevant period, **DAVENPORT** authorized Dohn to pay over $8,000,000 to **BALLEW**-controlled entities; and **BALLEW** correspondingly paid over $4,000,000 to **DAVENPORT**-controlled entities.

### *Gilbert Avenue Project through CSS*

25. Dohn had multiple campuses in the Southern District of Ohio. In and around March 2022, Dohn entered a lease agreement for property located on Gilbert Avenue in Cincinnati, Ohio (the "Gilbert Avenue Project"). Between in and around March 2022 to May 2024, **BALLEW** submitted CSS invoices to Dohn, care of **DAVENPORT**, to convert property located at the Gilbert Avenue property into an educational facility.

26. **BALLEW**, CSS, or entities working at their direction did not perform the work set forth in the CSS invoices submitted by **BALLEW** to Dohn. But **DAVENPORT** authorized payment on the invoices, and **BALLEW** kicked back proceeds from the Dohn payments to **DAVENPORT**. During this period, Dohn paid approximately $1,400,000 to CSS for fraudulent invoices associated with the Gilbert Avenue Project that were submitted by CSS. **BALLEW**, through CSS, then paid approximately $350,000 to **DAVENPORT**-controlled accounts.

27. For example, on or about October 15, 2022, CSS submitted an invoice to Dohn that described four services for the Gilbert Avenue Project: "drop ceiling and lighting fixtures with extension on air ducts," "install bathrooms for male and female capacity," "electric outlets per city code and lighting for classrooms and office," and "section off basement with frame studs and build 4 classrooms"—all for $106,000. After **BALLEW** emailed the invoice to **DAVENPORT** and Dohn Employee 1, **DAVENPORT** replied to all on the email on or about November 1, 2022 and stated to Dohn Employee 1: "I had capital [CSS] rush this job because inspection [sic] are coming up this week. They completed the work. Ballew let them know we are aware and the payment will be processed asap [sic] !" Neither **BALLEW** nor CSS performed the work on the invoice at the Gilbert Avenue Project. On November 22, 2022, Dohn paid CSS $106,000. The next day CSS kicked back $30,000 to **DAVENPORT** through CCSC.

28. On or about September 30, 2023, CSS billed to Dohn for "HVAC rough-in re-run ducts vents for efficiency and drawings" for the Gilbert Avenue Project that totaled $205,500. A deposit of $120,000 was due on receipt and $85,500 was due on completion. But **BALLEW**, CSS, or entities working at their direction did not perform the work set forth in the invoice. Dohn paid $120,000 on October 5, 2023 and $85,500 on October 25, 2023 signaling completion of the work. Again, **BALLEW** kicked back payments to **DAVENPORT**. The $120,000 payment (paid October 5, 2023) to CSS was deposited into the **BALLEW** controlled Core bank account ending in 0927 on October 5, 2023. From October 3 to October 10, 2023, the Core account ending in 0927 sent three wire transfers totaling $96,000 to an AD Staffing bank account controlled by **DAVENPORT**. The $85,500 payment to CSS from Dohn (paid October 25, 2023) was deposited into the **BALLEW** controlled CSS account ending in 8375 on October 27, 2023. The same day, the **BALLEW** controlled Core account ending in 0927 wired $85,500 to the CCSC account controlled by **DAVENPORT**. Three days later, **BALLEW** transferred $90,000 from CSS to his Core account ending in 0927.

29. On or about May 20, 2024, **BALLEW** emailed a CSS invoice to a Dohn employee and **DAVENPORT** for $55,100 work at the Gilbert Avenue Project. The description of the work included "repair roof with rubber sealant for roof and repair leaks and gutter repair," replace an electrical panel, and address water damage. **BALLEW**, CSS, or entities working on their behalf did not perform this work. On or about the same day, Dohn wrote a check to CSS for $55,100. On or about May 21, 2024, CSS transferred $35,000 to Core; that same day, Core wired $25,000 to **DAVENPORT** through CCSC.

30. **BALLEW** created a fraudulent contract between CSS and Dohn for work on the Gilbert Avenue Project. Specifically, on or about November 28, 2023, **DAVENPORT** emailed

**BALLEW** a proposed contract between Dohn and Company 1, a construction management company proposing work for the Gilbert Avenue Project. **BALLEW** responded to the email with a substantially similar contract except "Capital School Services LLC" replaced Company 1 in the contract. A signed version of that contract between Dohn and CSS contained a fraudulently inserted signature of the president of Company 1 under the name "Capital School Services LLC," which called for services by CSS at the Gilbert Avenue Project totaling $583,486. The fraudulent contract was backdated to July 2023.

***Professional Services and Training through Core***

31. **BALLEW** used Core to fraudulently overcharge Dohn for professional services and then kickback proceeds of payments from Dohn to **DAVENPORT**. **DAVENPORT** authorized Core to serve as the "middleman" between third parties performing professional services and training and Dohn. As part of this scheme, **BALLEW** and Core submitted grossly inflated invoices to Dohn for work done by subcontractors. **DAVENPORT** authorized the payment from Dohn, then received kickbacks from the **BALLEW**-controlled entities. From in and around January 2021 to in and around August 2024, Dohn paid Core over $5,000,000 for professional services; and **BALLEW**, through Core, paid over $3,000,000 back to **DAVENPORT**-controlled accounts.

32. For example, on or about July 9, 2021, an employee of University 1 emailed a teacher licensure program for Dohn educators to **DAVENPORT**. Ten minutes after receiving the email, **DAVENPORT** forwarded the email to **BALLEW**, who responded: "Man this is another home run!!!" **BALLEW** then immediately responded again, "But where does core come in at?"

33. At **DAVENPORT's** direction, University 1 submitted invoices to Core, and Core invoiced Dohn for services provided by University 1. Specifically, between 2022 and 2024,

University 1 invoiced approximately $97,000 to Core under the program with Dohn; and Core submitted six payments to University 1 totaling approximately $72,000 during that period. Based on invoices submitted by **BALLEW**, Dohn nevertheless paid Core approximately $821,500 for University 1-related invoices between 2021 and 2024.

34. For example, on or about October 13, 2022, Core invoiced to Dohn $150,000 for a teacher certification program "in partnership with [University 1]." The only payment from Core to University 1 around that period was a wire transfer on or about November 15, 2022 for $12,951.90. Dohn paid the invoice to Core through a $35,000 payment on October 25, 2022; another $40,000 check that same day; and two $37,500 checks on October 26, 2022, totaling the $150,000 invoiced amount. On or about the next day, October 27, 2022, **BALLEW** paid $110,000 to **DAVENPORT** through a wire from Core to CCSC.

35. In addition, on or about June 22, 2022, Core submitted an invoice to Dohn for services "conducted by '[Counseling Company 1]'" for $100,000, including a $50,000 deposit. On or about June 28, 2022, Dohn authorized two checks to Core totaling $60,000; the next day, Core wired $50,000 to **DAVENPORT** through CCSC. On or about July 6, 2022, Dohn paid the reminder on the invoice, $40,000; that same day, Core again wired $50,000 to **DAVENPORT** through CCSC. Core paid Counseling Company 1 less than $10,000 for work during the relevant period.

***Student Training Program through Progressive***

36. **BALLEW** and **DAVENPORT** also defrauded Dohn through Progressive. Between 2021 and 2024, Dohn utilized a cloud-based training program for students through Company 2. But, instead of Dohn contracting directly with Company 2 for the program, **DAVENPORT** authorized Progressive to serve as the "middleman" between Company 2 and

Dohn. Company 2 invoiced Progressive for approximately $59,420 for Dohn's use of the training program from 2021 and 2024. Pursuant to the scheme, **BALLEW** and Progressive then invoiced Dohn, and Dohn paid Progressive, approximately $832,000 for Dohn to use that same training program through Company 2 during that same period. **BALLEW** again kicked back proceeds to accounts controlled by **DAVENPORT**, including approximately $360,000 to **DAVENPORT**-controlled entities.

37. For example, on or about September 23, 2022, Progressive invoiced $100,000 to Dohn for Company 2's services, which was broken down into a $70,000 deposit and $30,000 remaining amount due. On September 28, 2022, Dohn paid two $35,000 checks to Progressive, satisfying the $70,000 deposit. On or about October 12, 2022, Dohn paid the remaining $30,000 to Progressive. On October 3, 2022, **BALLEW** purchased two cashier checks totaling $80,000 paid out of the Progressive account that were deposited into **DAVENPORT's** CCSC account.

***Special Education and Services through Elite***

38. **BALLEW**, through Elite, fraudulently invoiced Dohn for special education training, professional services, and accreditation services. **DAVENPORT** again authorized Elite to serve as the "middleman" between third parties performing these services and Dohn. **BALLEW** used Elite like his other entities—he submitted fraudulently inflated invoices to Dohn then kicked back proceeds to **DAVENPORT**. Between August 2021 and January 2024, Dohn paid approximately $932,000 to Elite through invoices submitted by **BALLEW**. **BALLEW** then wired $288,000 from Elite to **DAVENPORT** through CCSC.

39. For example, on or about July 11, 2022, Elite invoiced to Dohn $107,000 for "[Nonprofit 1] Accreditation Summer Framework Implementation." The invoice indicated that Elite was providing a "consultant fee invoice" for accreditation from Nonprofit 1. Neither Dohn

nor CCSC were accredited through Nonprofit 1 during the relevant period. Dohn paid the invoice through four checks to Elite from August 25 to 26, 2022, totaling $107,000. Elite then sent three payments to **DAVENPORT** through CCSC—on or about August 26 for $60,000, August 29 for $20,000, and September 2 for $27,000—totaling $107,000.

***DAVENPORT and BALLEW Spend Proceeds of Fraud***

40. **DAVENPORT** and **BALLEW** spent the proceeds of their scheme to defraud to further their own interests. This included funding businesses controlled by **DAVENPORT**. This also included spending lavishly on luxury automobiles and rental properties.

41. For example, in and around October 2023, **DAVENPORT** and **BALLEW** both signed a twenty-four-month rental agreement for luxury vacation property in the Miami, Florida area for $30,000 per month. **BALLEW** paid the majority of the rental payments out of **BALLEW's** Core account 0927.

**COUNTS 1 to 4**
**(Wire Fraud)**

42. Paragraphs 1 through 39 of the Indictment are incorporated here.

43. From approximately 2021 through 2024, in the Southern District of Ohio and elsewhere, the defendants, **LEANDO RAMONE DAVENPORT** and **JONATHAN LARRY BALLEW**, knowingly devised and intended to devise a continuing scheme and artifice to defraud Dohn of money and property through materially false and fraudulent pretenses, representations, and promises and to deprive Dohn of its intangible right to **DAVENPORT's** honest services through the payment of kickbacks to **DAVENPORT**, and transmitted and caused the transmission of wire communications in interstate commerce in furtherance of the scheme.

## PURPOSE OF SCHEME

44. The purpose of the scheme and artifice was for the defendants, **LEANDO RAMONE DAVENPORT** and **JONATHAN LARRY BALLEW**, to use **DAVENPORT's** position as Operator of Dohn through CCSC to enrich **DAVENPORT** and **BALLEW**. This was done in large part by **DAVENPORT** authorizing payments from Dohn to entities controlled by **BALLEW** based on false and fraudulent invoices submitted by **BALLEW** and then **BALLEW** kicking back proceeds of payments from Dohn to **DAVENPORT**.

## MANNER AND MEANS

45. The scheme and artifice was carried out in the following manner and means, among others:

a. **BALLEW** submitted false and fraudulent invoices to Dohn on behalf of entities he controlled, including fake invoices to Dohn for work that **BALLEW** and his entities did not perform and grossly inflated invoices for work and services performed by third parties.

b. **DAVENPORT** authorized payments from Dohn to entities controlled by **BALLEW** knowing that the invoices were false and fraudulent.

c. **DAVENPORT** authorized payment from Dohn to entities controlled by **BALLEW** knowing that **BALLEW** and his entities did not perform the work and services set forth in the invoices submitted to Dohn.

d. **DAVENPORT** authorized payment from Dohn to entities controlled by knowing that **BALLEW** and his entities fraudulently overcharged for work and services.

e. **DAVENPORT** authorized **BALLEW** and his entities to serve as the "middleman" between Dohn and third parties knowing that **BALLEW** would fraudulently overcharge for the services provided by third parties.

f. **BALLEW** received payment from Dohn knowing that **BALLEW** and his entities did not perform the work and services set forth in the invoices.

g. **BALLEW** received payment from Dohn knowing that he fraudulently overcharged for work and services performed by third parties.

h. **DAVENPORT**, in his role as Operator of Dohn through CCSC, authorized secret payments from Dohn to entities controlled by **BALLEW** with the intent that **BALLEW** would kick back proceeds of those payments to entities controlled by **DAVENPORT**, for **DAVENPORT's** benefit.

i. **DAVENPORT** authorized the payment of money from Dohn to **BALLEW**-controlled entities in exchange for kickbacks from **BALLEW**.

j. **BALLEW** kicked back proceeds of payments his entities received from Dohn to **DAVENPORT**-controlled entities, for **DAVENPORT's** benefit.

k. **DAVENPORT** instructed Dohn employees to prioritize payments from Dohn to entities controlled by **BALLEW**.

l. **DAVENPORT** and **BALLEW** concealed from Dohn the nature of their relationship.

m. **DAVENPORT** concealed from Dohn that he received kickbacks from **BALLEW's** entities that were proceeds of payments that **DAVENPORT** authorized Dohn to pay to **BALLEW**-controlled entities.

n. **BALLEW** fraudulently altered a contract submitted to Dohn for work at the Gilbert Avenue Project.

o. **DAVENPORT** knowingly caused Dohn to materially overstate the number of full-time equivalent students enrolled at Dohn to increase Dohn's revenue and to further the scheme.

## USE OF INTERSTATE WIRES

46. On or about the dates listed below, in the Southern District of Ohio and elsewhere, the defendant, **LEANDO RAMONE DAVENPORT** and **JONATHAN LARRY BALLEW**, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds:

| Count | On or About Date | Description of wire communication |
|---|---|---|
| Count 1 | July 9, 2021 | Email from BALLEW to DAVENPORT stating, "But where does core come in at?" |
| Count 2 | November 21, 2022 | Email from DAVENPORT to Dohn Employee 1 and BALLEW stating: "I had capital rush this job because inspection [sic] are coming up this week. They completed the work. Ballew let them know we are aware and the payment will be processed asap [sic] !" |
| Count 3 | October 27, 2022 | $110,000 wire transfer from Core account 0927 to CCSC account 0044 |
| Count 4 | October 27, 2023 | $85,500 wire transfer from Core account 0927 to CCSC account 0044 |

**In violation of 18 U.C.C. §§ 1343 and 1346**.

## COUNTS 5 to 6
### (Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity)

47. Paragraphs 1 through 41 of the Indictment are incorporated here.

48. On or about the dates specified below, in the Southern District of Ohio and elsewhere, the defendant, **JONATHAN LARRY BALLEW**, aided and abetted by the defendant, **LEANDO RAMONE DAVENPORT**, did knowingly engage in a monetary transaction by

through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and which in fact was derived from specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, through the following:

| Count | On or About Date | Amount | Monetary Transaction |
|---|---|---|---|
| 5 | May 21, 2024 | $30,000 | Wire transfer from Core account 0927 to Sunshine Vacation Rentals |
| 6 | July 18, 2024 | $30,000 | Wire transfer from Core account 0927 to Sunshine Vacation Rentals |

**In violation of 18 U.SC. §§ 1957 and 2.**

**COUNT 7**
**(Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity)**

49. Paragraphs 1 through 40 of the Indictment are incorporated here.

50. On or about October 5, 2023, in the Southern District of Ohio and elsewhere, the defendant, **JONATHAN LARRY BALLEW**, did knowingly engage in a monetary transaction by through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and which in fact was derived from specified unlawful activity, namely, the defendant wired $67,221.89 in currency from Core bank account 0927 to Fort Lauderdale Collection to pay for a 2022 Bentley Continental, knowing that such funds were derived from wire fraud, in violation of Title 18, United States Code, Section 1343.

**In violation of 18 U.S.C. § 1957.**

**COUNT 8**
**(Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity)**

51. Paragraphs 1 through 40 of the Indictment are incorporated here.

52. On or about October 31, 2023, in the Southern District of Ohio and elsewhere, the defendant, **LEANDO RAMONE DAVENPORT**, did knowingly engage in a monetary transaction by through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and which in fact was derived from specified unlawful activity, namely, the defendant signed and transferred a check in in the amount of $149,989.99 from Cincinnati Charter School Collaborative bank account 0044 to Fort Lauderdale Collection South to pay for a 2021 Rolls-Royce, knowing that such funds were derived from wire fraud, in violation of Title 18, United States Code, Sections 1343, 1346.

**In violation of 18 U.S.C. § 1957.**

**FORFEITURE ALLEGATION 1**

Upon conviction of one or more of the offenses set forth in Counts 1 through 4 of this Indictment, the defendants, **LEANDO RAMONE DAVENPORT** and **JONATHAN LARRY BALLEW**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense(s) including, but not limited to, a sum of money equal to the amount of proceeds the defendants obtained as a result of the offense(s) in the form of a forfeiture money judgment.

## FORFEITURE ALLEGATION 2

Upon conviction of one or more of the offenses set forth in Counts 5 through 8 of this Indictment, the defendants, **LEANDO RAMONE DAVENPORT** and **JONATHAN LARRY BALLEW**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense(s), and any property traceable to such property including, but not limited to, a sum of money equal to the amount of money involved in the offense(s) in the form of a forfeiture money judgment.

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of a defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of the defendants, up to the value of the property described above.

**A TRUE BILL.**

/s/

**FOREPERSON**

**DOMINICK S. GERACE II**
**UNITED STATES ATTORNEY**

**MATTHEW SINGER (6297632 IL)**
**Assistant United States Attorney**



TAN